IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DIAMOND MCMILLEN, | ) | CASE NO. 1:20-cv-2531 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Diamond Ann McMillen ("Plaintiff" or "Ms. McMillen") seeks judicial review

of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying

her application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the

reasons set forth below, the undersigned recommends that the final decision of the Commissioner

be **AFFIRMED**.

## I.  Procedural History

On September 6, 2018, Ms. McMillen filed an application for DIB.[1]  (Tr. 178-85.)  She

alleged a disability onset date of February 20, 2018.  (*Id.*)  She alleged disability due to vision

---

[1]  The ALJ noted that Ms. McMillen did not satisfy the special earnings requirements of the Social Security Act for
Title II disability benefit purposes, as the majority of her employment was for a government agency which is not
covered by Social Security.  (Tr. 17.)  Her DIB application was therefore deemed filed for the purpose of
establishing eligibility for Medicare coverage as a Medicare-qualified government employee.  (*Id.*, citing 20 CFR
404.1018b).

problems, back problems, neck problems, COPD, Fibolmlaysia [sic], depression, anxiety disorder, breathing problems, insomnia, bulging disc, slipped discs, and herniated discs.  (Tr. 50.)  Ms. McMillen's application was denied at the initial level (Tr. 112-18.) and upon reconsideration (Tr. 120-24), and she requested a hearing (Tr. 127-29)  On March 10, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 33-47.)

On April 1, 2020, the ALJ issued a decision finding that Ms. McMillen had not been under a disability within the meaning of the Social Security Act from February 20, 2018 through the date of the decision.  (Tr. 12-32.)  On October 19, 2020, the Appeals Council denied Ms. McMillen's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

On November 10, 2020, Ms. McMillen filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case. (ECF Docs. 15, 17.)

## II. Evidence

### A.      Personal, Educational, and Vocational Evidence

Ms. McMillen was born in 1974, and was 44 years old on the alleged disability onset date, making her a younger individual under Social Security Regulations at all relevant times. (Tr. 26.)  She had at least a high school education and was able to communicate in English.  (*Id*.) Ms. McMillen had not worked since February 20, 2018, the alleged onset date.  (Tr. 18.)

### B.      Medical Evidence

#### 1.      Relevant Treatment History

Early in the morning on February 21, 2018, Ms. McMillen was treated at the Emergency Department of Fairview Hospital after being assaulted.  (Tr. 261.)  She reported that two women

2

hit her several times in the face and head, and kicked in the left chest wall.  (*Id.*, Tr. 264.)  On examination, she had "some small hematomas to the scalp and along the forehead," but otherwise normal findings.  (Tr. 262.)  X-rays revealed an acute displaced left midclavular fracture as well as a nondisplaced coronoid process fracture of the ulna, "which may be old injury."  (Tr. 272.)  Dr. Donald J. Renault assessed a closed head injury, multiple contusions, and a left clavicle fracture. (Tr. 263.)  Dr. Renault assessed her condition as "stable," provided a sling for her left arm, referred her for an orthopedic follow up, prescribed Norco for pain control, and discharged her.  (Tr. 263, 272.)

On February 26, 2018, she followed up with primary care provider John Hanicak, M.D. (Tr. 258.)  Dr. Hanicak noted that Ms. McMillen had "multiple bruises and marks," including a large bruise on her right knee, had "sustained a left collar bone fracture," and her left arm was in a sling.  (Tr. 258, 260.)  Her diagnoses included trauma, pulmonary nodule, chronic neck pain, closed displaced fracture of left clavicle with routine healing, herniated cervical disc C6-7, C5-6, C4-5, and depression.  (Tr. 260.)  Dr. Hanicak recommended that she follow up with orthopedics for her fracture and obtain a CT scan to assess her pulmonary nodule.  (Tr. 260.)  He noted she was "doing better on Trazodone" for her depression.  (*Id.*)  No treatment recommendations were noted for her neck pain or herniated cervical discs.  (*Id.*)

A March 21, 2018 telephone encounter with Dr. Hanicak's office reflected that Ms. McMillen was unsure when she would return to work, but had an appointment with orthopedics scheduled for March 23, 2018.  (Tr. 255.)  An April 3, 2018 telephone encounter reflected that Ms. McMillen requested an appointment with Dr. Hanicak because her right leg remained painful and was "getting worse from her being assaulted."  (Tr. 254.)  She reported that she was not taking anything for the pain, and had a hard time bearing weight on the leg.  (*Id.*)  Dr.

Hanicak recommended that she follow up with orthopedics. (*Id*.) In an April 24, 2018 telephone encounter, Ms. McMillen requested and obtained a letter stating she was still unable to work, reporting that her orthopedic provider said she might need physical therapy. (Tr. 253.)

Ms. McMillen returned to Dr. Hanicak for a follow up appointment on July 27, 2018. (Tr. 245). Physical examination findings were normal. (Tr. 248.) Dr. Hanicak diagnosed Attention Deficit Disorder ("ADHD"), depression, herniated cervical discs at C4-C7, chronic obstructive pulmonary disease ("COPD"), insomnia, smoking, acute exacerbation of chronic bronchitis, and chronic neck pain. (Tr. 248.) Dr. Hanicak noted that Ms. McMillen was on multiple classes of controlled substances, including Adderall for ADHD, Hydrocodone for pain, and Zolpidem for insomnia. (*Id*.) She reportedly saw pain management for her narcotic prescriptions, and pain management had asked Dr. Hanicak to take over prescribing the ADD medications and sleep aids. (*Id.*) He noted the risk of polypharmacy, and indicated he wanted to start decreasing her medications. (*Id*.) Although she was "open to this," she reported being frustrated with the persistence of her symptoms. (*Id*.) He also noted that she was receiving treatment from the Orthopedics Department, where surgery had been considered but not recommended for various reasons, including her smoking. (*Id*.) He recommended physical therapy and/or alternative treatments such as acupuncture, and increased her Trazadone to twice daily to treat her depression and chronic pain. (*Id*.). Strategies for quitting smoking were discussed, and Ms. McMillen was encouraged to quit smoking. (*Id.*)

An MRI of Ms. McMillen's cervical spine on December 18, 2018, revealed degenerative disc disease, disc herniations, and ossification of posterior longitudinal ligament, with severe canal and neural foraminal compromise and considerable indentation/flattening of her spinal cord. (Tr. 415-16.) Specifically, the MRI showed C2-3 mild spinal canal stenosis, C3-4

4

moderate spinal canal stenosis and severe right neural foraminal stenosis due to disc herniation,
C4-5 moderate spinal canal stenosis and moderate right neural foraminal stenosis, resulting in
mild flattening of the cervical spinal cord, C5-6 moderate spinal canal stenosis and severe right
and mild left neural foraminal stenosis, resulting in mild flattening of the cervical spinal cord,
and C6-7 severe spinal canal and neural foraminal stenosis bilaterally.  (Tr. 416-17). The
radiologist called Dr. Hanicak to inform the doctor on the worsening of Ms. McMillen's spinal
stenosis compared to a prior MRI taken in February 2018, indicating it required "semi-urgent
attention." (Tr. 409, 416.)  A neurosurgery consult was ordered.  (Tr. 410.)

On January 21, 2019, Ms. McMillen was evaluated by neurosurgeon Dr. Jeremy Amps.
(Tr. 404-08.)  Ms. McMillen reported neck pain for over 15 years, that had been worse in the last
year, radiating down both arms to her fingers, and weakness in both arms.  (Tr. 404.)  Dr. Amps
noted that previous conservative treatments had included muscle relaxants, opioids, and
membrane stabilizers.  (Tr. 405.)  On examination, Dr. Amps noted severe pain to very light
touch of cervical spine and paraspinals, normal and symmetrical muscle bulk and tone, full
motor strength in all muscle groups, and a normal sensory examination.  (Tr. 407.)  Dr. Amps
reviewed the MRI and identified Ms. McMillen's situation as "complex," stating that chronic
neck pain is difficult to treat with surgery and recommending an evaluation with psychology or
chronic pain.  (Tr. 408.)  He noted that the cervical stenosis might require surgery but noted "she
must quit smoking first." (*Id*.)

Ms. McMillen returned to Dr. Hanicak on February 28, 2019, reporting she was having a
hard time, and feeling sad and frustrated by financial issues and her chronic medical conditions.
(Tr. 451.)  She continued to report low back and neck pain, with loss of strength in her hands.
(*Id*.)  Dr. Hanicak noted no abnormal findings on examination.  (Tr. 454.)  Her diagnoses

included ADD, acute sinusitis, insomnia, depression, herniated cervical disc, smoker, myofibrositis cervical, PTSD, and chronic low back pain.  (Tr. 454-55.)  With respect to her mental impairments, he noted "[s]he is doing well on current doses" of her ADD medication, which "allows her to be able to achieve normal function" with no side effects.  (Tr. 454.)  Ambien was not helping her insomnia all of the time, as she sometimes woke in severe pain.  (*Id.*)  With respect to her PTSD, she continued to experience significant hyperarousal with fear of going outside the home.  (*Id.*)  She "had been seen by psychology for disability" for her PTSD.  (*Id.*)  With respect to her cervical diagnoses, he noted chronic cervical myofibrositis and stable herniated discs with worsening pain and decreased grip strength.  (*Id.*)  Ice and heat was recommended for her low back pain.  (Tr. 455.)

Ms. McMillen followed up again with Dr. Hanicak on June 7, 2019, reporting she was "doing OK" but still struggled with chronic pain in her back and neck, as well as hand weakness.  (Tr 475.)  She was following with neurosurgery.  (*Id.*)  On examination, physical findings were within the normal range, except for 4/5 grip strength bilaterally.  (Tr. 478.)  Her diagnoses included intervertebral cervical disc disorder with myelopathy and cord compression, and she was following with neurosurgery, pain management, and physical therapy.  (*Id.*)

A September 6, 2019 cervical MRI showed a mild progression of degenerative changes, including moderate to severe spinal canal stenosis at the C5-6, C6-7 levels.  (Tr. 484-85.)

Ms. McMillen returned to Dr. Hanicak on October 11, 2019, reporting "feeling unbelievably down and sad" since the recent death of her 23-year-old son.  (Tr. 486.)  She declined medication changes or grief counseling, and was assessed as "in a state of disbelief and shock."  (Tr. 489.)  Her chronic neck pain was not discussed.  (Tr. 490.)

6

On November 11, 2019, Ms. McMillen had a follow-up pain management appointment with Dr. Maria Shedlock of Cleveland Pain Specialists.  (Tr. 496-98.)  Ms. McMillen reported pain in her neck and low back, with radiating pain and numbness down her right arm.  (Tr. 498.)  Medications reportedly reduced her pain to 7/10 but caused constipation.  (*Id*.)  She reported painful range of motion with twisting and bending of her neck, confirmed by positive Spurling's maneuver, but her gait was normal and she was able to make a fist.  (Tr. 499.)  She was still distraught and crying over the death of her son, and it was noted that her primary care provider had prescribed Xanax.  (*Id*.)  Dr. Shedlock prescribed hydrocodone, baclofen, and gabapentin for her cervical disc disorder and lumbar radiculopathy, and recommended she see her primary care provider for her grief and possibly an antidepressant.  (Tr. 499-500.)

Ms. McMillen had a follow up pain management appointment with Wendy Turk, CNP on December 9, 2019, complaining of pain in her neck and lower back, as well as numbness and tingling to her bilateral hands and wrists.  (Tr. 504-05.)  On examination, she had a normal gait with no assistive devices and inflammation in the left side of her neck.  (Tr. 505.)  She admitted to painful range of motion with twisting or bending of her neck and complained of numbness and tingling in her hands and wrists.  (*Id.*)  She was alert and oriented, but still crying and emotional due to the passing of her son.  (*Id.*)  Her diagnoses continued to include cervical disc disorder with myelopathy, cervical arthritis, and lumbar radiculopathy, with additional notes of chronic pain, long-term drug therapy, and drug-induced constipation.  (*Id*.)  CNP Turk made no medication changes or referrals, continuing Ms. McMillen's prescriptions for gabapentin and baclofen for her cervical impairments, and hydrocodone for her lumbar impairment.  (Tr. 505-06.)  She was instructed to return in twenty-eight days.  (Tr. 506.)

Ms. McMillen returned to Dr. Hanicak for a recheck on December 13, 2019.  (Tr. 512.)
Dr. Hanicak observed she was "still having a hard time" since her son's passing.  (*Id.*)  Physical
examination results were in the normal range.  (Tr. 514.)  Diagnoses included chronic neck pain,
grief reaction, insomnia, cord compression, herniated cervical disc, depression, and cervical
DDD.  (Tr. 515.)  Dr. Hanicak noted that she "continue[d] to suffer from daily pain," "ha[d] not
been considered to be a candidate for surgery," followed with pain management, and was on
trazodone for chronic pain.  (*Id.*)  He added Prozac for grief reaction and depression at the
suggestion of chronic pain management, "to assist with getting through the next few months."
(*Id.*)  He noted disability forms were completed and sent.  (*Id.*)

At her January 13, 2020 pain management appointment, Ms. McMillen continued to
report radiating pain and numbness in her right arm, with painful range of motion in the neck
(Tr. 523, 525-26). On examination, she demonstrated a normal gait, positive Spurling's
maneuver, and improvement in mood.  (Tr. 526.)  Prescriptions were continued for gabapentin,
baclofen, and hydrocodone, and magnesium oxide was prescribed for cramp and spasm in a
lower limb.  (Tr. 527.)

### 2.    Opinion Evidence

#### i.    Consultative Examination

On November 19, 2018, Ms. McMillen met with clinical psychologist, Dr. Richard
Davis, for a consultative examination.  (Tr. 381-86.)  Ms. McMillen reported that since the
assault, she had been afraid to leave her room, except when she was helping her parents around
the house, and would not leave the house unless her son came with her.  (Tr. 383-84.)  On
examination, Dr. Davis noted average appearance, cooperative behavior, coherent speech,
satisfactory flow of conversation and thought, and preoccupation with the assault.  (Tr. 384.)

Ms. McMillen demonstrated minor limitations in her ability to think logically, use common sense and judgment.  (*Id*.)  She was able to remember two of six words after a five minute interval, could remember six digits forward and four in reverse, and could not do serial sevens. (*Id*.)  Dr. Davis diagnosed adjustment disorder, with mixed anxiety and depressed mood, and PTSD, severe.  (Tr. 385.)  He noted Ms. McMillen "didn't have any problem sitting, standing, or moving about while in my office."  (Tr. 386.)

ii.        **Opinion of Plaintiff's Medical Provider**

On June 10, 2019, Dr. Hanicak completed a medical source statement regarding Ms. McMillen's physical capacity.  (Tr. 466-467.)  Dr. Hanicak opined that Ms. McMillen had the following physical functional limitations:

- lifting 1-2 pounds occasionally (Tr. 466);

- sitting, standing and walking for a total of less than one hour, and 30 minutes at a time, without interruption (*Id*.);

- rare reaching, pushing/pulling, fine and gross manipulation (Tr. 467);

- require the ability to alternate between sitting, standing, and walking at will (*Id*.); and

- experiences severe pain that interferes with concentration, takes her off task, and causes absenteeism (*Id*.).

Dr. Hanicak supported these limitations by referencing Ms. McMillen's diagnosis of cervical spine stenosis, disc disorder, myelopathy, and cord compression.  (Tr. 466-67.)  He also opined that Ms. McMillen required four hours of additional unscheduled periods of rest during an eight-hour workday.  (*Id*.)  He noted that a cane, walker, brace, and TENS unit were prescribed to treat her spinal stenosis, myelopathy, and cord compression.  (*Id*.)

Dr. Hanicak completed additional medical source statements regarding Ms. McMillen's physical and mental residual functional capacity on December 13, 2019.  (Tr. 491-94.)  In regard

to her physical capacity, Dr. Hanicak opined that Ms. McMillen had the following physical functional limitations:

- lifting less than five pounds occasionally and frequently (Tr. 491);

- sitting, standing, and walking were all limited to less than 30 minutes total in an eight-hour workday (*Id.*);

- rarely reach, push/pull, and perform fine and gross manipulations (*Id.*);

- occasionally balance, couch, and kneel (*Id.*); and

- need to elevate her legs and alternate between sitting, standing, and walking at will (*Id.*).

Dr. Hanicak supported these opinions by referencing Ms. McMillen's diagnoses of intervertebral cervical disc disorder with myelopathy, cervical spinal stenosis, and cord compression.  (*Id.*)  He also opined that Ms. McMillen's severe pain interfered with concentration, took her off task, caused absenteeism, and would require additional unscheduled rest periods.  (*Id.*)

In regard to her mental capacity, Dr. Hanicak opined that Ms. McMillen would have extreme limitations in her ability to: respond to requests, suggestions, criticism, correction, and challenges; keep social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness; sustain an ordinary routine and regular attendance at work; work a full day without needing more than the allotted number or length of rest periods; adapt to changes; manage one's psychologically-based symptoms; and make plans for oneself independent of others.  (Tr. 493-94.)  He further opined she would have marked limitation in her ability to: ask for help when needed; handle conflicts with others; initiate or sustain a conversation; work at an appropriate and consistent pace; complete tasks in a timely manner; ignore or avoid distractions while working; change activities or work settings without being disruptive; and work close to or with others without interrupting or distracting them.  (*Id.*)  He opined she had a moderate

10

impairment in all other mental functions identified on the check-box form.  (*Id*.)  He noted that he had treated her for more than 15 years, and supported his opinions by referencing Ms. McMillen's diagnosis of herniated cervical disc at C6-7, C5-6, and C4-5.  (*Id*.)

### iii.      State Agency Reviewers

On December 5, 2018 state agency reviewing physician Mary Congbalay, M.D., reviewed the record and opined that Ms. McMillen had the following physical functional limitations:

- can lift and/or carry 20 pounds occasionally, and 10 pounds frequently (Tr. 58);

- can stand, walk, and sit for a total of six hours in an eight-hour workday (*Id*.);

- can occasionally climb ladders/ropes/scaffolds (Tr. 59);

- frequent reaching overhead bilaterally (*Id*.); and

- avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation (Tr. 60).

On March 4, 2019, state agency reviewing physician Diane Manos, M.D. reviewed the record and concurred with the earlier opinion of Dr. Congbalay.  (Tr. 89-91.)

On December 6, 2018 state agency reviewing psychologist Vicki Warren, Ph.D., reviewed the record and opined that Ms. McMillen's affective disorders caused moderate restrictions in interacting with others and concentration, persistence, or maintaining pace; and mild restrictions in adapting and managing oneself.  (Tr. 56.)  She opined that Ms. McMillen would require a stable work environment with superficial contact with others and without high production/pace quotas.  (Tr. 61-62.)  On March 5, 2019, state agency reviewing psychologist Todd Finnerty, Psy.D., reviewed the record and concurred with the opinion of Dr. Warren.  (Tr. 92-93.)

### C.     Hearing Testimony

#### 1.     Plaintiff's Testimony

At the March 10, 2020 hearing, Ms. McMillen testified that she applied for disability because the pain in her neck, arm, and lower back had gotten worse in the past two years.  (Tr. 37.)  She reported dropping things like pens and cups of pop, and said it felt like her hands were falling asleep.  (Tr. 37-38, 41.)  She had both a hard and a soft neck brace, and recently used the hard one.  (Tr. 38.)  She used it daily for about an hour, whenever it hurt to hold her head up. (*Id*.)  She stated it was very uncomfortable to hold her head in one position, sit for long periods of time, stand, and sometimes to lie down.  (Tr. 38-39.)  She saw a pain management specialist every twenty-eight days, and took Gabapentin, Baclofen, and Vicodin for her pain.  (Tr. 40.)

When asked how she took care of things like grocery shopping, cooking, cleaning, and laundry, she responded "with great care," noting that she lived with her parents and they all helped one another.  (Tr. 39.)  More specifically, she testified that she could do laundry and some cooking, but "not too much" cleaning.  (*Id*.)  Her friends and brothers helped with the cleaning and carrying laundry.  (*Id*.)  She reported that it hurt when she raised her arms over her head to brush her hair; she still did it, but more slowly than she used to.  (Tr. 40.)  She reported being able to lift a gallon of milk comfortably with both hands.  (Tr. 41.)  She could sit for maybe forty-five minutes before she got up and walked around, and could stand maybe half an hour before she needed to sit.  (Tr. 41-42.)  She testified that she spent three-fourths of her day lying down because it hurt to hold her neck up, and then her arm hurt, and she got "tired of doing the same stuff."  (Tr. 42.)

### 2.     Vocational Expert's Testimony

A vocational expert ("VE") testified at the hearing, and opined that a hypothetical individual of Ms. McMillen's age, education, and experience with the following limitations could perform her past work as a parking attendant cashier, as well as representative jobs that included merchandise marker, sales attendant, or housekeeping cleaner: light work: no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing and stooping, kneeling, crouching, crawling, and overhead reaching; no concentrated exposure to temperature extremes, humidity or environmental pollutants; no exposure to hazards such as heights, machinery, or commercial driving; performing routine tasks in a low stress environment, with no fast-paced production or quotas, frequent changes, and superficial interpersonal interaction with coworkers, supervisors, and the public.  (Tr. 43-44.)  The vocational expert further testified there would be no jobs an individual could sustain if the person was off-task 20% of the time (Tr. 45).

In response to questions from Ms. McMillen's counsel, the VE testified that a hypothetical individual with the same mental health limitations as the prior hypothetical would not be capable of performing Ms. McMillen's past work or any other work if also limited to sedentary work with the ability to "rarely" reach in all directions, push, pull, or perform fine or gross manipulation.  (Tr. 45.)  The VE further testified that an individual with the same limitations, but with the ability to "occasionally" reach in all directions, push, pull, or perform fine or gross manipulation, would also be unable to perform Ms. McMillen's past work or any other work.  (Tr. 45-46.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform other work available in

the national economy.  *Id.*

### IV. The ALJ's Decision

In his March 27, 2020 decision, the ALJ made the following findings:[2]

1.    The claimant's date last insured status for potential Medicare-coverage
      purposes was September 30, 2019.  (Tr. 17.)

2.    The claimant has not engaged in substantial gainful activity since February
      20, 2018, the alleged onset date. (Tr. 18.)

3.    The claimant has the following severe impairments: degenerative disc
      disease of the cervical spine, adjustment disorder with mixed anxiety and
      depressed mood, post-traumatic stress disorder (PTSD), chronic
      obstructive pulmonary disease (COPD), and attention deficit/hyperactivity
      disorder (ADHD).  (*Id.*)

4.    The claimant does not have an impairment or combination of impairments
      that meets or medically equals the severity of the listed impairments in 20
      C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

5.    The claimant has the residual functional capacity to perform light work as
      defined in 20 CFR 404.1567(b) and 416.967(b), except that she cannot
      climb ladders, ropes, or scaffolds; is limited to occasionally climbing
      ramps and stairs, balancing, stooping, kneeling, crouching, crawling; is
      limited to occasional overhead reaching bilaterally, but not limitation of
      lateral reaching; she cannot have concentrated exposure to temperature
      extremes, humidity, or environmental pollutants, and no exposure to
      hazards such as heights, machinery, or commercial driving; and mentally,
      she can perform routine tasks in a low stress environment (no fast pace,
      strict quotas, or frequent duty changes) involving superficial interpersonal
      interactions with coworkers, supervisors, and the public (no arbitration,
      negotiation, or confrontation).  (Tr. 20.)

6.    The claimant is capable of performing past relevant work as a parking lot
      attendant/cashier.  (Tr. 25.)

---

[2] The ALJ's findings are summarized.

7.     Although the claimant is capable of performing past relevant work, there
are other jobs existing in the national economy that she is also able to
perform. (Tr. 26.)

Based on the foregoing, the ALJ determined that Ms. McMillen had not been under a

disability, as defined in the Social Security Act, from February 20, 2018, through the date of the

decision on March 27, 2020.  (Tr. 27.)

## V. Plaintiff's Arguments

In her Brief, Ms. McMillen raises two legal issues:

1.  Whether the Administrative Law Judge erred in her consideration of the persuasiveness
of Dr. Hanicak's medical opinion.

2.  Whether the residual functional capacity, finding the Plaintiff capable of performing light
work, is supported by substantial evidence.

(ECF Doc. 15 p. 1.)

## VI. Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the

Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.** **First Assignment of Error: Whether ALJ Analysis of Treating Doctor Opinions Was Adequately Explained and Supported By Substantial Evidence**

Ms. McMillen asserts that the ALJ erred in analyzing the opinions of her treating physician, John Hanicak, M.D.  (ECF Doc. 15 p. 10.)  First, she argues that the ALJ inaccurately concluded that Dr. Hanicak's opinions failed to cite objective evidence in support and were inconsistent with the medical evidence of record.  (*Id*. at p. 11.)  Second, she argues the ALJ failed to adequately explain his basis for finding the opinions were inconsistent or unsupported. (*Id*.)  The Commissioner responds that "the ALJ reasonably found Dr. Hanicak's extreme opinions unpersuasive" and that his physical health opinions were "unsupported by his own treatment notes."[3]  (ECF Doc. 17 pp. 7-8 (citing Tr. 466-67, 491-92).)

**1.** **Standard for Analysis of Medical Opinion Evidence**

The Social Security Administration's current regulations for evaluation of medical opinion evidence apply here.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.  Five categories of evidence are considered under these regulations: (1) objective medical evidence; (2) medical opinions; (3) other medical evidence; (4) evidence from non-medical sources; and (5) prior administrative medical findings. 20 C.F.R. § 416.913(a)(1)-(5).

The regulations specify that SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical

---

[3] The Commissioner also argues that Dr. Hanicak's opinion as to Ms. McMillen's mental health was based on a physical impairment alone and "entirely unsupported." (ECF Doc. 17 pp. 8.)  This argument is directed at the medical source statement regarding Ms. McMillen's mental capacity, in which Dr. Hanicak's opinion is explicitly based on her diagnosis of herniated cervical discs.  (Tr. 493-94.)  While Ms. McMillen refers generally to "Dr. Hanicak's opinions" in her brief, the only opinions she cites within the relevant argument are the two medical source statements regarding her physical capacity.  (ECF Doc. 15 pp. 11-12 (citing Tr. 466-67, 491-92).)  Therefore, any arguments relating to Dr. Hanicak's mental capacity opinion (Tr. 493-94) are deemed waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.").

finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a).

Distinct from a prior framework that gave more weight to opinions from treating sources, the

new regulations provide that "administrative law judges will now evaluate the 'persuasiveness'

of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the

regulation." *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D.

Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at *4 (W.D. Ky. Mar. 9, 2020)

(citing 20 C.F.R. § 404.1520c(a) and (b)); *see also Ryan L. F. v. Comm'r of Soc. Sec.*, No. 6:18-

CV-01958-BR, 2019 WL 6468560, at *4 (D. Or. Dec. 2, 2019) ("Although the regulations

eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning

'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical

opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'") (citing 20 C.F.R.

§§ 404.1520c(a) and (b) (1), 416.920c(a) and (b) (1)) (alterations in original)).

The five factors to be evaluated are supportability, consistency, relationship with the

claimant, specialization, and other factors, but supportability and consistency are acknowledged

to be the most important factors for consideration. 20 C.F.R. § 416.920c(c)(1)-(5); 20 C.F.R. §

416.920c(b)(2). The regulations define "supportability" as follows: "The more relevant the

objective medical evidence and supporting explanations presented by a medical source are to

support his or her medical opinion(s) or prior administrative medical finding(s), the more

persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §

416.920c(c)(1). The regulations define "consistency" as follows: "The more consistent a medical

opinion(s) or prior administrative medical finding(s) is with the evidence from other medical

sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior

administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

**2.      Whether ALJ Erred in Finding Opinions of Treating Provider Unpersuasive**

Ms. McMillen focuses her challenge on the ALJ's analysis of Dr. Hanicak's two opinions

regarding her physical functional capacity, which the ALJ addressed as follows:

> The claimant's primary care physician, Dr. John Hanicak submitted several opinion statements regarding her physical and mental limitations.  The undersigned finds his opinions unpersuasive.  …
>
> Dr. Hanicak submitted an opinion dated June 10, 2019, which the undersigned also finds unpersuasive (Exhibit 8F). Dr. Hanicak noted he has treated the claimant for over 15 years. He opined that she could occasionally lift 1 to 2 pounds; she was limited to standing/walking for less than 1 hour in an 8 hour workday and sitting for 30 minutes at a time without interruption; she could rarely perform postural activities, reach, push or pull, or perform fine and gross manipulations; she needed to alternate positions at will; and she would need four hours of rest during a workday, in addition to normal breaks (*id.*). The opinion also noted she was prescribed a cane, walker, brace, and TENS unit. <u>Dr. Hanicak cited the diagnosis of cervical degenerative disc disease and severe pain to support his opinion; however, he did not include specific examination findings to support his opinion. His opinion is inconsistent with his treating records, as well as with the other medical records</u>. For example, his examinations rarely noted abnormal findings (Exhibits 7F/11; 9F/11; 14F/8). During an examination with a neurologist, the claimant exhibited normal gait, full strength in all muscle groups, intact sensation, and normal reflexes (Exhibit 4F/10). <u>The record also contained no evidence of a prescription for a cane or walker or use of any assistive device during appointments</u>.
>
> Dr. Hanicak submitted another opinion dated December 13, 2019 (Exhibit 11F). He now opined that she could carry less than five pounds occasionally; sit/stand/walk for less than 30 minutes total; rarely climb, stoop, and crawl; occasional balance, crouch, and kneel; rarely reach, push, pull, and perform fine and gross manipulation. He noted she did not have a prescription for a cane or walker. He further opined that she needed to alternate positions at will, elevate her legs at will, and needing four hours of rest during a workday. <u>Dr. Hanicak again cited the diagnosis of cervical degenerative disc disease and severe pain to support his opinion; however, he did not include specific examination findings to support his opinion. His opinion is inconsistent with his treating records, as well as with the other medical records</u>. For example, his examinations rarely noted abnormal findings (Exhibits 7F/11; 9F/11; 14F/8). During an examination with a neurologist, the claimant exhibited normal gait, full strength in all muscle groups, intact sensation, and normal reflexes (Exhibit 4F/10). Examinations at the pain management clinic showed painful range of motion in the neck, but normal gait and ability to make a fist (Exhibit 13F/5, 11).

(Tr. 24 (emphasis added).)

20

With respect to the ALJ's observation that Dr. Hanicak "did not include specific examination findings to support his opinion" (*id.*), Ms. McMillen responds that Dr. Hanicak referenced her diagnoses of "cervical disc disorder, myelopathy, cervical spinal stenosis, and cord compression as the basis for his opinions" (ECF Doc. 15 p. 11 (citing Tr. 466-67, 491-92)). It is undisputed that Dr. Hanicak cited to those diagnosis in support of his opinions, as was acknowledged in the ALJ's discussion above.  (Tr. 24.)  The record also clearly reflects that the ALJ correctly observed that Dr. Hanicak did not reference specific examination findings in support of his opinions (*id.*; Tr. 466-67, 491-92), and Ms. McMillen does not offer argument to the contrary (ECF Doc. 15 at p. 11).

With respect to the ALJ's observation that Dr. Hanicak's opinions were "inconsistent with his treating records, as well as with the other medical records" (Tr. 24), Ms. McMillen argues that "the ALJ's analysis as to the alleged inconsistencies is minimal" and the ALJ failed to adequately explain how the opinions were inconsistent or unsupported (ECF Doc. 15 p. 11). The arguments and citations offered by the ALJ will therefore be examined in further detail.

### i. Supportability Analysis

In support of his finding that Dr. Hanicak's opinions were inconsistent with his own treating records, which goes to "supportability" under 20 C.F.R. § 416.920c(c)(1), the ALJ cited to the records for three office visits in 2019, explaining "[f]or example, [Dr. Hanicak's] examinations rarely noted abnormal findings."  (Tr. 24 (citing Tr. 454 (2/28/19 physical exam), 478 (6/7/19 physical exam), 514 (12/13/19 physical exam).)  The supportability standard establishes that the persuasiveness of a medical opinion depends in part on how relevant "the objective medical evidence and supporting explanations presented by a medical source are to support" the opinion.  20 C.F.R. § 416.920c(c)(1).

21

Consistent with the ALJ's characterization of this evidence, a review of the records cited by the ALJ reveals that Dr. Hanicak's objective physical examination findings in February and December 2019 were normal, and his findings in June 2019 were normal except for a decreased range of motion in the neck and grip strength reduced to 4/5 bilaterally.  (Tr. 454, 478, 514.) This is also consistent with the ALJ's own summary of the relevant examination findings earlier in the decision.  (Tr. 22.)  A review of Dr. Hanicak's other physical examination findings shows that he observed bruising, decreased range of motion in the neck, and an arm sling shortly after Ms. McMillen's assault in February 2018 (Tr. 260) and noted normal findings in July 2018 (Tr. 248).  As a whole, the undersigned concludes that there is substantial evidence in the record to support the ALJ's observation that Dr. Hanicak's "examinations rarely noted abnormal findings," particularly given the ALJ's more specific and accurate detailing of those findings earlier in the decision.  (Tr. 22, 24.)

Ms. McMillen next asserts that the ALJ's references to Dr. Hanicak's findings on examination "demonstrate the ALJ's cherry picking of evidence," because he did not reference "any other evidence adverse to [the ALJ's] opinion."  (ECF Doc. 15 p. 11.)  With respect to Dr. Hanicak's records in particular, Ms. McMillen argues that his opinions were supported by "Ms. McMillen's reported symptoms, observable medical signs, and medical imaging."  (*Id.* at p. 12.) A review of the three treatment records cited by the ALJ reveals the following:

- At the February 28, 2019 office visit, "SUBJECTIVE" notes indicated Ms. McMillen had been seen by neurosurgery and was "being monitored very carefully," that Dr. Hanicak had "received an urgent call from radiology regarding the severity of her MRI neck results," and that she reported lost strength in her hands.  (Tr. 451.)  His "ASSESSMENT" noted "worsening pain and decreased grip strength" in the context of herniated cervical discs.  (Tr. 454.)  He encouraged smoking cessation.  (*Id.*)

- At the June 7, 2019 office visit, "SUBJECTIVE" notes indicated Ms. McMillen was "doing OK" but continued to struggle with "chronic pain in her back and neck as well as weakness in her hands," and was following with neurosurgery.  (Tr. 475.)  His

22

"ASSESSMENT" noted she was following with neurosurgery, pain management, and physical therapy.  (Tr. 478.)

- At the December 12, 2019 office visit, the "ASSESSMENT" indicated she "continue[d] to suffer from daily pain," was not considered a candidate for surgery, followed with pain management, and was on trazodone for pain (Tr. 515).  He again encouraged cessation of smoking.  (*Id.*)

Thus, Dr. Hanicak's records do contain subjective reports of chronic pain and hand weakness, as well as references to an "urgent call" from radiology and ongoing treatment with neurosurgery, pain management, and physical therapy.  As Ms. McMillan points out in her brief, the records also note treatment for an assault in February 2018 (Tr. 258) and reference treatment with pain management and orthopedics in July 2018, where Ms. McMillan was reportedly a surgical candidate but they "held off on surgery for various reasons including the fact that she is smoking" (Tr. 248).  (ECF Doc. 15 pp. 12-13.)  Ms. McMillan also correctly notes that the records contain references to pain medications.  (*Id.* at 13 (citing Tr. 248, 515).)

While the above elements of Dr. Hanicak's records – subjective reports of pain and limitation, prescribed medications, and reported treatments or recommendations involving other providers – were not specifically highlighted by the ALJ in his analysis of Dr. Hanicak's opinions, the Sixth Circuit has repeatedly explained that an ALJ need not "reproduce the list of these treatment records a second time when [he] explain[s] why [an] opinion was inconsistent with this record."  *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").

Here, a review of the decision as a whole reflects that the ALJ provided a thorough and accurate description of Dr. Hanicak's treatment records, acknowledging his findings relating to the February 2018 assault, Ms. McMillen's treatment with pain medications like hydrocodone,

her continued complaints of chronic pain and hand weakness, and Dr. Hanicak's characterization of her neck MRI as showing "severe disc herniation." (Tr. 21-22.)  The decision also reflects that the ALJ noted "[t]he claimant's treatment throughout the relevant [sic] was conservative, consisting of medication only." (Tr. 22.)  It is further observed that the record does not appear to contain treatment records for the orthopedic provider referenced by Dr. Hanicak (Tr. 248, 253-55), that the ongoing treatment with neurosurgery that was referenced by Dr. Hanicak was apparently limited to a single evaluation (Tr. 404-08, 451, 475), and the pain management treatments referenced by Dr. Hanicak were limited to medications alone, consistent with the ALJ's observation (Tr. 22, 478, 499-500, 505-06).

It is generally recognized that an ALJ may not cherry pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See, e.g., Gentry v. Comm'r*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where ALJ failed "to address certain portions of the record, including the evidence of a continuing illness that was not resolved despite use of increasingly serious and dangerous medications"); *Minor v. Comm'r*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis).  Yet, "the ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Solembrino v. Astrue*, No. 1:10–cv–1017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011).  The Sixth Circuit has explained that allegations of cherry-picking evidence by the ALJ are "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. Apr. 3, 2014) (citing *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009) (finding "little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.")).

24

Upon a review of the decision as a whole, the undersigned concludes that the record does not support a finding that the ALJ engaged in "cherry picking" with respect to Dr. Hanicak's treatment records.  Although he appropriately did not summarize every finding in those records, he did not mischaracterize evidence or conspicuously omit discussion of pertinent information. He emphasized the limited objective findings by Dr. Hanicak in support of his conclusions regarding the "supportability" of Dr. Hanicak's opinions, but first accurately discussed Dr. Hanicak's records as a whole, noting the conservative nature of Ms. McMillen's treatment for her physical impairments throughout the relevant time.  Thus, it is evident that the ALJ's analysis of "supportability" was supported by substantial evidence.

### ii.  Consistency Analysis

In support of his finding that Dr. Hanicak's opinions were inconsistent with other medical records, which goes to "consistency" under 20 C.F.R. § 416.920c(c)(2), the ALJ cited to physical examination findings by neurologist Jeremy Amps, MD and pain management providers Dr. Maria Shedlock and Wendy Turk, CNP.  (Tr. 24 (citing Tr. 407 (1/21/19 physical exam), 499 (11/11/19 physical exam), 505 (12/9/19 physical exam).)  The consistency standard establishes that the persuasiveness of a medical opinion depends in part on how consistent that opinion is "with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 416.920c(c)(2).  Ms. McMillen argues that Dr. Hanicak's opinions and treatment notes were "consistent with the totality of the medical record and reports from other providers."  (ECF Doc. 15 p. 13.)  Further, she contends that the ALJ "cherry picked the evidence" when he omitted discussion of most of the medical treatment and findings by radiology, neurosurgery, and pain management in making his findings regarding Dr. Hanicak's opinions.  (*Id.* at p. 14.)

A review of the three treatment records cited by the ALJ reveals the following:

25

- At the January 21, 2019 neurosurgery visit, physical examination findings were consistent with what the ALJ described in evaluating Dr. Hanicak's opinions (normal gait, strength, sensation, and reflexes), but also reflect "severe pain to very light touch of cervical spine and paraspinals." (Tr. 24, 407.)  In the "HISTORY" section, Ms. McMillen reported worsening neck pain radiating to the arms and fingers, with occasional numbness and tingling in the hands and arms and weakness in both arms and hands, and continued to smoke one pack per day of cigarettes.  (Tr. 404-05.)  In the "ASSESSMENT" section, Dr. Amps described "a complex situation," with chronic neck pain that is difficult to treat with surgery and cervical stenosis that "might require surgery," but would first require Ms. McMillen to quit smoking.  (Tr. 408.)  He recommended an evaluation with psychology or chronic pain.  (*Id.*)

- As to the November 11, 2019 pain management visit, physical examination findings are consistent with what the ALJ described in evaluating Dr. Hanicak's opinions (painful range of motion in the neck, normal gait, ability to make a fist), but also reflect a positive Spurling's test.  (Tr. 24, 499.)  The records also reflect complaints of neck and back pain radiating down the right arm, with numbness down the right arm, as well as prescriptions for pain medications.  (Tr. 498-500.)

- At the December 9, 2019 pain management visit, physical examination findings are consistent with what the ALJ described in evaluating Dr. Hanicak's opinions (painful range of motion in the neck, normal gait, ability to make a fist), but also reflect inflammation in the left side of her neck and complaints of ("C/O") numbness and tingling in the bilateral hands and wrists.  (Tr. 24, 505.)  The records also reflect complaints of neck and back pain without any radiating pain, with medications helping with pain control.  (Tr. 504.)  Prescriptions were continued.  (Tr. 505.)

Ms. McMillen also accurately notes that there is significant cervical imagery that was not specifically referenced by the ALJ in his discussion of Dr. McMillen's opinions.  (ECF Doc. 15 p. 13 (citing Tr. 409-10, 416-17).)

As noted in the supportability analysis above, the Sixth Circuit has held that an ALJ need not "reproduce the list of these treatment records a second time when [he] explain[s] why [an] opinion was inconsistent with this record." *Crum*, 660 F. App'x at 457 (citing *Forrest*, 591 F. App'x at 366); *Bledsoe*, 165 F. App'x at 411.  A review of the record as a whole reveals that the ALJ provide a detailed and accurate summary of Ms. McMillen's cervical imagery, as well as detailed and accurate descriptions of the relevant neurology and pain management records.  (Tr. 21-22.)  Ms. McMillen's brief does not identify material findings in the record that were not

26

appropriately acknowledged in the ALJ's discussion of the evidence. Further, as previously noted above, after providing an accurate description of the complaints, findings, and treatment modalities set forth in the medical records, the ALJ noted "[t]he claimant's treatment throughout the relevant [sic] was conservative, consisting of medication only." (Tr. 22.)

The Sixth Circuit has repeatedly emphasized the need to review the ALJ's decision as a whole. *See, e.g., Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts.") (quoting *Loral Defense Systems–Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). Although Ms. McMillen asserts that the ALJ omitted important evidence through "cherry picking," a review of the record and the ALJ's decision reveals that he appropriately discussed the relevant evidence and findings earlier in his decision, in support of the RFC determination. (Tr. 21-22.) The undersigned accordingly cannot infer that the ALJ "overlook[ed] or ignore[d] contrary lines of evidence." (ECF Doc. 15 pp. 14-15 (citing cases).)

Although the point is not specifically argued by Ms. McMillen, the undersigned also notes that the ALJ was accurate in his finding that there are no records prescribing or supporting the medical necessity of ambulatory assistive devices, and at least three pain management examination records note "Gait normal. No assistive devices." (Tr. 499, 505, 526.) This is inconsistent with Dr. Hanicak's statement in his June 2019 opinion that she had been prescribed a cane and walker. (Tr. 467, 491.)

In this case, the ALJ's decision reflects that he considered the entirety of Ms. McMillen's treatment records, including the conservative nature of her treatment, and concluded that her

treating doctor's very limiting opinions as to her physical capacity were unpersuasive because they were not supported internally by specific examination findings and were inconsistent with the largely normal physical examination findings in both his own records and those of her neurologist and pain management providers.  While Ms. McMillen identifies cervical imagery, subjective complaints, certain exam findings, and references to possible surgery that could be supportive of the more restrictive limitations described by Dr. Hanicak, it is well-settled that "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  To second-guess the ALJ's persuasiveness finding in this case would ultimately interfere with the recognized "'zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).

For the reasons set forth above, the undersigned finds that substantial evidence supports the ALJ's conclusion that Dr. Hanicak's physical capacity opinions were unpersuasive. Accordingly, the undersigned finds Ms. McMillen's first assignment of error is without merit.

## C.    Second Assignment of Error: Whether Physical RFC Determination is Supported by Substantial Evidence

Ms. McMillen also asserts the ALJ erred because his RFC finding her capable of light work is not supported by substantial evidence. [4]  (ECF Doc. 15 pp. 15-16.)  More specifically, she argues that the "RFC determination does not account for the impact of Plaintiff's limited ability to stand, walk, and lift regarding light work, or the impact pain has upon her ability to sustain competitive employment," and fails to address her "manipulative limitations as a result of

---

[4] Ms. McMillen's challenge to the RFC addresses only her physical limitations, except for a brief statement that: "Non-exertional limitations were not accounted for by the ALJ."  (ECF Doc. 15 p. 15)  Any arguments relating to the mental RFC limitations are deemed waived.  *See McPherson*, 125 F.3d at 995–996.

28

her severe cervical condition." (*Id.* at p. 16.)  The Commissioner responds that Ms. McMillen "did not prove that the severity and functional impact of her cervical impairment required limitations beyond those assigned in the ALJ's RFC." (ECF Doc. 17 p. 12.)  Instead, the Commissioner asserts that "[t]he ALJ properly considered and discussed the entirety of the record evidence," and that Ms. McMillen's argument here "is nothing more than an improper invitation for this Court to reweigh the evidence." (*Id.* p. 13 (citing cases).)

Under SSA regulations, light work requires lifting and carrying of up to ten pounds on a frequent basis, and requires occasional lifting and carrying of up to twenty pounds.  *See* 20 C.F.R. § 404.1567(b); SSR 83-10, 1983-1991 Soc. Sec. Rep. Serv. 24 (Jan 1, 1983).  A light work job requires "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*  "[T]he full range of light work requires standing or walking, off and on, for a total of 6 hours of an 8-hour workday." *Id.*  "To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

The ALJ determined that Ms. McMillen had the RFC to perform to perform light work with the following additional physical limitations:

> she cannot climb ladders, ropes, or scaffolds; is limited to occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, crawling; is limited to occasional overhead reaching bilaterally, but not limitation of lateral reaching; she cannot have concentrated exposure to temperature extremes, humidity, or environmental pollutants, and no exposure to hazards such as heights, machinery, or commercial driving.

(Tr. 20.)  In challenging the RFC, Ms. McMillen asserts that is does not account for her limitations in standing, walking, and lifting, does not acknowledge the impact of her chronic pain, and fails to address her manipulative limitations.  (ECF Doc. 15 pp. 16-17.)  To the extent that this argument is predicated on Ms. McMillen's assertion that the ALJ erred in his weighing

of Dr. Hanicak's opinion, that issue was addressed above and will not be revisited herein.  Her

other arguments are addressed below.

       **1.**      **Whether Substantial Evidence Supported RFC Findings Regarding Ability to Stand, Walk, Lift, and Perform Manipulative Activities**

      Ms. McMillen argues that "substantial evidence of record shows that [she] does not have

the capacity to perform the significant standing, walking, and lifting required of light work," and

that the sedentary occupational base would be significantly eroded if her RFC was instead

"found to be at a sedentary capacity, with the appropriate manipulative limitations imposed."

(ECF Doc. 15 pp. 16-17.)  The "appropriate manipulative limitations" she references appear to

be the significant restriction to "rarely" or "occasionally" reaching, pushing, pulling, and

performing fine and gross manipulation discussed with the VE at her hearing.  (Tr. 45-46.)  In

support, she points to her subjective complaints of neck and arm pain with numbness and

weakness, her cervical imagery showing worsening, statements that surgery may be warranted,

her treatment with pain medications, and the opinions of Dr. Hanicak.  (ECF Doc. 15 p. 17

(citing various treatment records).)

      As an initial matter, it is noted that the issue before this court is not whether substantial

evidence supports Ms. McMillen's asserted functional restrictions, but instead whether the ALJ's

less restrictive RFC determination was supported by substantial evidence.  Even if Ms.

McMillen's asserted limitations were supported by substantial evidence, this Court cannot

overturn the Commissioner's decision "so long as substantial evidence also supports the

conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

      Here, the record clearly reflects that the ALJ considered the evidence cited by Ms.

McMillen regarding her subjective complaints, imagery, surgical considerations, and use of pain

medications.  With regard to her subjective reports of neck and arm pain and numbness, the ALJ

acknowledged that she reported to her neurologist "having neck pain . . . radiating into the bilateral posterior arms to all five fingers and occasional numbness/tingling in the hands and weakness in both arms."  (Tr. 21.)  He also noted that she reported "chronic pain in her back and neck, as well as weakness in her hands" to her primary care physician at multiple appointments. (Tr. 22.)  He also acknowledged that Ms. McMillen's pain management providers noted at three visits that she exhibited "painful range of motion with twisting or bending of the neck."  (*Id.*)

With regard to the imaging, the ALJ noted: "Imaging showed mild progression of degenerative changes at C5-C7 level, with worsened moderate and severe spinal canal stenosis at those levels and unchanged neural foraminal stenosis."  (Tr. 22.)  He also noted her neurologist informed her that her chronic neck pain was "a complex situation" that "was difficult to treat with surgery and he recommended an evaluation with psychology or chronic pain."  (*Id.*)  If those options failed to provide relief, he noted that "[t]he cervical stenosis might require surgery, but she must quit smoking first." (*Id.*)

With regard to her treatment with pain medication, the ALJ noted that Ms. McMillen "is in a pain management clinic and has been since the end of 2016."  (Tr. 21.)  The ALJ further noted she "treated her cervical pain with Hydrocodone (*Id.*), and summarized notes from pain management visits in November and December 2019 and January 2020, noting "[t]he claimant's treatment throughout the relevant [sic] was conservative, consisting of medication only" (Tr. 22.)

The ALJ also identified other evidence that was supportive of his RFC determination, including physical examinations noting "normal and symmetrical muscle bulk and tone in the upper and lower extremities, full strength in all muscle groups, intact sensation, normal gait, and normal reflexes," and normal gait. (Tr. 21-22.)  He observed that she continued to smoke despite advice for cessation (Tr. 21), and additionally noted that she was advised following a

31

neurosurgical evaluation that she must quit smoking to be considered for neck surgery (Tr. 22).

The ALJ also pointed out that her treatment was "conservative, consisting of medication only"

throughout the relevant period.  (Tr. 22.)  While Dr. Hanicak indicated in his first physical

opinion that a cane and walker had been prescribed (Tr. 467), the ALJ noted that the record

contained "no evidence of a prescription for a cane or walker or use of any assistive device

during appointments" (Tr. 24).

Finally, the ALJ explained that his RFC determination was more restrictive than the

physical functional capacity assessed by both state agency reviewing physicians, who "opined

that the claimant could perform light exertion work, with additional restrictions of occasional

climbing ladders, ropes, or scaffolds, frequent overhead reaching with arms, and avoiding

concentrated exposure to pulmonary irritants."  (Tr. 23.)  Specifically, the ALJ noted that he

reduced overhead reaching to "occasional," and added limitations to occasional balancing,

stooping, kneeling, crouching, and crawling.  (Tr. 20, 23.)  The undersigned notes an additional

added limitation to "no exposure to hazards such as heights, machinery, or commercial driving."

(Tr. 20, 60, 91.)  The state agency physicians had explicitly recognized that their proposed

limitations to light work with frequent overhead reaching were due to herniated cervical discs

and neck pain, but with normal strength and sensation on examination.  (Tr. 59, 89-90.)

Ms. McMillen asserts that the ALJ "selectively chose the mildest of findings" in support

of his RFC, and accordingly "failed to build an accurate and logical bridge between the evidence

and the result."  (ECF Doc. 15 pp. 17-18 (citations omitted).)  On the contrary, the complete text

of the ALJ's decision makes it clear that he considered the evidence highlighted in Ms.

McMillen's brief, but disagreed with her assessment of the level of limitation that the evidence

supported.   This Court cannot review the relevant evidence *de novo*, and the Sixth Circuit has

made it clear that the Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan*, 474 F.3d at 833.

Here, the ALJ's RFC determination regarding Ms. McMillen's exertional and manipulative limitations was supported by substantial evidence. Although the record contains notable cervical imagery, references to possible surgical intervention, subjective complaints of pain and limitation, and treatment with pain medications, it also reflects that physical examination findings were largely normal, her treatment was conservative, and she did not take recommended actions or otherwise follow-up regarding surgical intervention.

For the reasons set forth above, the undersigned finds that substantial evidence supported the ALJ's conclusion that Ms. McMillen could perform light work with the postural and manipulative limitations set forth in the RFC.

### 2. Whether Substantial Evidence Supported Findings Regarding Subjective Complaints of Pain

Ms. McMillen asserts that the ALJ also erred by ignoring Dr. Hanicak's assessment of "sustainability" and evidence of pain relating to her cervical stenosis. (ECF Doc. 15 p. 16.) The argument pertaining to the ALJ's consideration of Dr. Hanicak's opinion will not be revisited here, but the argument regarding subjective pain is addressed below.

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms. SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)). If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. SSR 16-3p, 82 Fed Reg. 49462, 49463;

33

*Rogers,* 486 F.3d at 247.  When the alleged symptom is pain, the ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c).  *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).  Factors relevant to a claimant's symptoms such as pain include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).  There is no dispute that the first step is met in this case (Tr. 21), so the discussion herein will focus on the second step.

A review of the decision as a whole reveals that the ALJ considered the entire record, based his determination on multiple factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467.  In particular, the ALJ acknowledged Ms. McCormick's reports of pain, including "that she is unable to work due to pain in her arm and lower back" (Tr. 21), "having neck pain for over fifteen years, but with increased pain since the assault [in February 2018]" (*id.*), and "chronic pain in her back and neck, as well as weakness in her hands" (Tr. 22).  The ALJ noted her treatment for pain was "conservative, consisting of medication only" (Tr. 22).  He also noted imaging showing "mild progression" of her degenerative spinal disease (Tr. 22), examination findings of "normal and symmetrical muscle bulk" (Tr. 21) and "normal gait" (Tr. 22).

The record supports the ALJ's finding that Ms. McMillen had largely normal physical examination results throughout the record, including normal gait (Tr. 407, 499, 505, 526), normal sensory examinations (Tr. 407, 537), and normal muscle tone and bulk (Tr. 407, 537). All of this evidence is supportive of the ALJ's conclusion that Ms. McMillen's pain was less limiting than she alleged.  Further, the record supports the ALJ's assertion that Ms. McMillen's

34

treatment was conservative, and limited to pain medications.  (Tr. 405, 533.)  There is no evidence suggesting she followed up with neurosurgery after being advised that she must quit smoking to be considered a surgical candidate for her cervical stenosis (Tr. 408).

As the Sixth Circuit has explained, it is appropriate for an ALJ to consider evidence of conservative or nonaggressive treatment when assessing a claimant's credibility.  *McKenzie v. Comm'r, Soc. Sec.*, 215 F.3d 1327, at *4 (6th Cir. 2000) (unpublished) (finding "the ALJ reasonably evaluated Plaintiff's credibility with respect to his residual functional capacity given the lack of aggressive treatment" where treatment for allegedly disabling pain consisted of medication and chiropractic treatment).  Considering the evidence regarding her physical examinations and conservative treatment, the undersigned finds that substantial evidence supported the ALJ's finding that Ms. McMillen's statements regarding her symptoms were "inconsistent with the medical evidence of record" (Tr. 21) and that she retained the ability to perform light work within the limitations set forth in the RFC (Tr. 20).

For all of the reasons discussed above, the undersigned finds that substantial evidence supported the ALJ's RFC determination, and accordingly concludes that Ms. McMillen's second assignment of error is without merit.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the

Commissioner be **AFFIRMED**.


March 11, 2022

/s/Amanda M. Knapp

_____

AMANDA M. KNAPP
United States Magistrate Judge


## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may forfeit the right to appeal the District Court's order.  *See
Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140
(1985).